UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

STEPHEN S. KREIN,

       Plaintiff,

v.                                       Civil Action No. 2:11-cv-0962

WEST VIRGINIA STATE POLICE and
TROOPER L. W. PRICE, individually
and in his official capacity,

       Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>

       Pending is the motion by defendants the West Virginia
State Police (the "State Police") and Trooper L. W. Price for
summary judgment, filed January 7, 2013.


I. Background

       In this action, plaintiff Stephen S. Krein asserts
various constitutional and statutory claims against the West
Virginia State Police and two of its troopers arising out of a
confrontation that occurred on December 1, 2008.  Krein is a
resident of Kanawha County, West Virginia.  The State Police is
an agency of the State of West Virginia.  Trooper Price is
employed by the State Police.

Inasmuch as Krein has no personal recollection of the confrontation, the court reconstructs the events from allegations in the complaint and factual statements appearing in affidavit and interview testimony of other witnesses.

After making inquiries as to Krein's whereabouts on December 1, 2008, Trooper Price set out around 7:00 p.m. with Trooper W. S. Snyder[1] (together, the "troopers") to locate Krein for the purpose of effectuating active warrants for his arrest. In a later statement, Price explained that "probably four or five Troopers were looking for [Krein]" and he "figured [he]'d help." Price Stmt./Aff. 1. Regarding his knowledge of those troopers' reasons for seeking Krein, Trooper Price stated, "I know a week ago that Corporal Mooney and Sergeant McCord I guess received a BOLO, they made contact with a vehicle and he almost ran over Sergeant McCord in his vehicle." Id. at 2. Although Krein had been served warrants for "domestic related" charges a month prior,[2] Trooper Price stated that on the date of the incident, "[t]he only thing [Krein] had [regarding outstanding

_____

[1] The amended complaint also named Trooper Snyder as a defendant in this action. The court's June 27, 2012 order dismissed Trooper Snyder without prejudice to the amendment, if good cause be shown, of the amended complaint to rejoin him. Krein has not requested such an amendment.
[2] Trooper Price stated that Krein "ran from" the officers who served these warrants and "then got on a four wheeler and I think he almost ran into [one of the officers] on the four wheeler." Price Stmt./Aff. 2.

warrants for his arrest], of my knowledge, was the incident with Corporal Mooney and Sergeant McCord." <u>Id.</u>

Troopers Price and Snyder traveled in Trooper Price's cruiser with Trooper Snyder riding as passenger. Snyder Stmt. 2. They set up a surveillance point overlooking Route 119 in Roane County, West Virginia. Around 9:20 p.m., as the troopers were leaving, they discovered Krein at Huffman's Country Store near the intersection of Route 119 and Ambler Ridge Road, near Walton, West Virginia. Compl. ¶¶ 4-6; Price Stmt./Aff. 5.

The relative positions of the vehicles and individuals during the encounter, while by no means altogether clear from the record, appear to have been as follows. Krein was sitting in his white Chevrolet truck, backed into the store and facing toward the road. Price Stmt./Aff. 5. A burgundy car was parked to the right of the truck, as viewed from the road. <u>Id.</u> Trooper Price estimated that the car was ten feet from Krein's truck. <u>Id.</u> Also nearby were one or more sets of fuel pumps, which are variously described as being immediately behind the truck or to its left. <u>Id.</u>; Snyder Stmt. 3.

Trooper Price pulled into the store's parking lot and positioned his cruiser at an angle in front of Krein's truck. Compl. ¶ 7. The officers did not activate the cruiser's emergency lights or sirens. <u>Id.</u> The passenger side of the

3

cruiser faced the truck, which was approximately six feet away.
Snyder Stmt. 6.  This created a small opening between the rear
of the cruiser and the burgundy car through which Krein could
reach the road and escape.  Price Stmt./Aff. 6.

Krein backed up his vehicle and hit a diesel fuel
pump.  Id.; Snyder Stmt. 3.  At the same time, Trooper Snyder
exited the cruiser and walked to the driver's side of the truck,
by the burgundy car.  Trooper Price exited the cruiser and
walked around the back to the cruiser's passenger side.  Krein
then drove forward and struck the cruiser "with only enough
force to close the door of the cruiser which had been left open
by defendant Snyder."  Compl. ¶ 10; Price Stmt./Aff. 6 ("And I
remember him pushing the door shut with his, with the truck.").
Trooper Snyder described the truck as "drifting on forward and
resting right up against the side of the cruiser."  Snyder
Stmt. 3.

Krein again backed up his vehicle.  Id.  Trooper Price
observed Krein "'cutting his wheel to come out in between a
small opening.  He was trying to get out.'"  Compl. ¶ 11
(quoting Price Stmt./Aff. 6).  Trooper Snyder stood "at a 45
degree angle away from the truck against another vehicle,"
presumably the burgundy car, with his gun drawn at low ready.
Snyder Stmt. 3.  Trooper Price positioned himself "directly in
front of Mr. Krein's truck" such that he was between the truck

and the cruiser. Id.; Compl. ¶ 13. While taking his position, Trooper Price drew his service weapon and began ordering Krein to stop and to exit the vehicle. Id. As the vehicle began moving forward, Trooper Price raised his weapon and fired a round, which struck "maybe possibly in the grill area of [Krein's] vehicle." Price Stmt./Aff. 8.[3]

At the same time, Krein leaned his head down into the passenger seat area of his vehicle to avoid being struck by the gunfire. Compl. ¶ 15. As described by Trooper Snyder, Krein "leaned over in his seat and grabbed the steering wheel and turned it." Snyder Stmt. 3. The truck continued coming forward. Price Stmt./Aff. 8. Trooper Snyder saw that Krein "was going to try to wedge through the hole to get out." Snyder Stmt. 3. Finding himself in that path, Snyder moved along the side of the Burgundy car "to get away from" Krein. Id. at 4.

The complaint alleges that Trooper Price then moved to the passenger's side of Krein's rolling truck and fired a second round, into the passenger side window. Compl. ¶ 16. Trooper Snyder's statement confirms that the second shot resulted in a

---

[3] Trooper Snyder appears to place the events in a slightly different order. According to his statement, Trooper Price fired the first shot just before Krein hit the cruiser. Snyder Stmt. 5 ("[A]s he was coming forward straight at Trooper Price, that's when he brought his weapon up and it went off and straight in front of him. Then he stepped off to the side and that's when Mr. Krein hit his cruiser. Then he backed up again and went to wedge himself out and Trooper Price fired another shot.").

bullet hole in the passenger side window.  See Snyder Stmt. 4
("And then Trooper Price pulled up and fired again and I seen
glass break on the passenger side door of the truck."); id. at 7
("I went to the passenger side of the truck which was, had a
hole roughly about five inches in diameter . . . .").  Neither
the position from which Trooper Price fired the second shot nor
the direction the bullet passed through the window, however, are
clear from the evidentiary record.

          Nonetheless, the evidence tends to suggest that
Trooper Price would have been at or near the passenger side of
the truck when the second shot was fired into that window.
Since Krein had rolled up the driver-side window, Snyder Stmt.
4, it appears unlikely that the bullet passed through the truck
from the driver's side and exited the passenger window.  Trooper
Snyder described Trooper Price's position as "at like a 45
degree angle off" from the truck.  Snyder Stmt. 7.  He did not
specify to which side of the truck, but Trooper Price's own
account indicates that he was angled off the truck's passenger
side.  Trooper Price stated that as Krein drove the truck toward
the hole between the cruiser and the maroon car, he feared being
crushed between the truck and the cruiser.  Price Stmt./Aff. 10
("I felt that vehicle would have crushed me in between that
vehicle and that cruiser had I not taken the action that I
did.").  It is well established that, as the truck exited

between the cruiser and the maroon car, the cruiser was to its passenger side.  Trooper Price's statement that a "hard left" would endanger Trooper Snyder further indicates that Trooper Price was not himself to the left.  See id. at 10-11 ("Ah he could have possibly cut a hard left but then Trooper Snyder's life would have been in danger.").  Trooper Snyder, however, as just noted, had stated that he moved along the side of the burgundy car to get away from the truck; thus, he moved safely away from the truck as it proceeded through the wedge.

Trooper Price's second shot struck Krein in the head. Compl. ¶ 16.  Trooper Price observed the truck begin to slow down.  Price Stmt./Aff. 8.  It "then coasted between the cruiser and [the burgundy] vehicle without striking either vehicle" and came to rest on the roadway.  Compl. ¶ 15; see also Snyder Stmt. 7 ("Mr. Krein's truck wedged through the hole and drafted up the road at a slow rate . . . .").  The troopers removed Krein from his vehicle and awaited the arrival of an ambulance.  Compl. ¶ 16.  In total, Trooper Price estimates that the events occurred over the span of approximately a minute.  Price Stmt./Aff. 9.

Two other individuals made statements regarding the events of the shooting.  Billy James Jett and Richard McKinney were both present at Huffman's Country Store around 9:00 p.m. at closing time, waiting to pick up their wives who work there

together.   Jett Aff. ¶ 2; McKinney Stmt. 1.   Jett stated that a
trooper "standing in front of Mr. Krein's truck took a quick
step to his right and, in quick succession, immediately fired
two shots."  Jett Aff. ¶ 14.    Krein "would have hit the trooper
. . . if the trooper had not taken a quick step to the right."
Id. ¶ 20. According to Jett, the trooper "may have twisted his
body and aimed for the driver's side window as he fired" the
second shot.  Id. ¶ 16.  He also stated that the truck had not
yet passed the trooper.  Id. ¶ 17.  Jett's statements that the
trooper had to move to the right to avoid the truck and that the
trooper aimed for the driver's side window appear to be
inconsistent with other testimony and might suggest that Jett
mistakenly believed Trooper Snyder fired the shots.  McKinney's
brief statement corroborates Krein's movements into the diesel
pump and into the cruiser door.  McKinney Stmt. 1.

     Jett placed a 911 call shortly after the events
unfolded.  See Opp'n Mot. Summ. J. Ex. A.  Jett stated to the
operator that "[t]wo state troopers, a truck tried to run over
them there and they had to fire shots."  Id. Ex. A, track 1.  He
later added that "they fired shots when he was pulling around
them."  Id.  Thereafter, Trooper Snyder got on the line and
stated, "He tried to ram us, tried to run us over with his

truck.  Trooper Price fired two shots at the individual striking him . . . ."  Id. Ex A, track 4.[4]

Krein initiated this action in the Circuit Court of Kanawha County, West Virginia, on December 6, 2010.  On November 28, 2011, Krein filed an amended complaint.  The amended complaint contains seven counts alleging causes of action -- three arising under 42 U.S.C. § 1983, and four arising under West Virginia law -- as well as a count requesting punitive damages, which does not amount to a stand-alone cause of action.

On December 2, 2011, the defendants removed the action to this court.  On January 2, 2012, the defendants filed a motion to dismiss, and following the court's June 26, 2012 order on that motion, the following claims remained for adjudication: 1) Federal Law Count I, excessive force in violation of the Fourth Amendment against Trooper Price; 2) State Law Count I, violation of Article III, section 6 of the West Virginia Constitution against Trooper Price; 3) State Law Count II, vicarious liability for violations of the West Virginia Constitution against the State Police; 4) State Law Count III, common law negligent hiring/retention/supervision against the State Police, and 5) State Law Count V, common law intentional

---

[4] Krein asserts that Trooper Snyder's words were "he tried to run from us in his truck; Trooper Price fired two shots at the individual . . . ."  Opp'n Mot. Summ. J. 4.  The recording plainly refutes this interpretation.

infliction of emotional distress against Trooper Price.  The
defendants' motion for summary judgment asserts the various
grounds set forth below.

## II. The Governing Standard

A party is entitled to summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  Material facts are
those necessary to establish the elements of a party's cause of
action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).

A genuine issue of material fact exists if, in viewing
the record and all reasonable inferences drawn therefrom in a
light most favorable to the non-moving party, a reasonable
factfinder could return a verdict for the non-movant.  <u>Id.</u>  The
moving party has the burden of "'showing' — that is, pointing
out to the district court — that there is an absence of evidence
to support the nonmoving party's case."  <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 325 (1986).  If the movant satisfies this
burden, the non-movant must respond by showing specific,
admissible evidence that establishes the existence of all
elements essential to the case.  Fed. R. Civ. P. 56(c); <u>Celotex</u>,

477 U.S. at 322–23.  A party is entitled to summary judgment if
the record as a whole could not lead a rational trier of fact to
find in favor of the non-movant.  <u>Williams v. Griffin</u>, 952 F.2d
820, 823 (4th Cir. 1991).


### III. Discussion


1.  Excessive Force in Violation of the Fourth Amendment

        Federal Law Count I asserts a claim against Trooper
Price for using excessive force in violation of Krein's Fourth
Amendment rights.  Claims that law enforcement officers have
used excessive force in the course of an arrest, investigatory
stop, or other seizure of a free citizen are analyzed under the
Fourth Amendment's reasonableness standard.  <u>Graham v. Connor</u>,
490 U.S. 386, 395 (1989).  Specifically, the Fourth Amendment
protects "[t]he right of the people to be secure in their
persons . . . against unreasonable . . . seizures."  U.S. Const.
amend IV.  Objective reasonableness is the touchstone of a
Fourth Amendment excessive force analysis, namely, whether an
officer knew or should have known that a particular seizure
qualified as excessive.  <u>See</u> <u>Henry v. Purnell</u>, 652 F.3d 524, 531
(4th Cir. 2011) (<u>en</u> <u>banc</u>); <u>Valladares v. Cordero</u>, 552 F.3d 384,
388-89 (4th Cir. 2009); <u>see</u> <u>also</u> <u>Graham v. Connor</u>, 490 U.S. 386,
396 (1989).  The test requires "careful attention to the facts

and circumstances of each particular case, including the
severity of the crime at issue, whether the suspect poses an
immediate threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to evade
arrest by flight." Id.

Additionally, inasmuch as "'police officers are often
forced to make split-second judgments -- in circumstances that
are tense, uncertain, and rapidly evolving,' the facts must be
evaluated from the perspective of a reasonable officer on the
scene, and the use of hindsight must be avoided." Waterman v.
Batton, 393 F.3d 471, 476-77 (4th Cir. 2005) (quoting Graham,
490 U.S. at 397) (internal citation omitted); see Elliott v.
Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) ("The court's focus
should be on the circumstances at the moment force was used and
on the fact that officers on the beat are not often afforded the
luxury of armchair reflection."). Deadly force is justified
when an officer "has sound reason to believe that a suspect
poses a threat of serious physical harm to the officer or
others." Elliott, 99 F.3d at 642.

The defendants contend that they should be granted
summary judgment on the constitutional claims because "[t]he
record is clear that Plaintiff used, and continued to attempt to
use, his vehicle as a weapon" and that Trooper Price
"justifiably feared for his life and Trooper Snyder's safety."

12

Mem. Supp. Mot. Summ. J. 9.  The court does not agree that the record, when taken in the light most favorable to Krein as it must be at this stage, paints so clear a picture and, accordingly, finds that a genuine issue of material fact remains as to the reasonableness of Trooper Price's actions.

Several facts could support a reasonable factfinder's determination that Trooper Price used excessive force.  The undisputed fact that Trooper Price fired the second shot through the truck's passenger window tends to indicate that the trooper was not in the vehicle's direct path.  Also, as Krein argues in his response to the motion, Trooper Price's statement could be interpreted to reveal a "preoccupation with Plaintiff's attempt to escape capture."  Opp'n Mot. Summ. J. 3.  In summarizing the events, Trooper Price makes several references to Krein wanting to escape and his efforts to prevent it, but does not cite the possibility of being struck by the truck as the motivation for any of his action.  Trooper Price's own fear is mentioned only at the end of the statement when the interviewing sergeant prompts him to explain why he made the decision to fire.  Price Stmt./Aff. 10-11.  Furthermore, Trooper Price's admission that Krein had previously escaped his custody could suggest that a desire to prevent a similar escape rather than the fear of harm motivated Trooper Price's actions.  See id. at 2 ("I had dealt

with him a month prior, about a month.  He fled from me.  I was unable to find him.  He got away that night from me.").[5]

In moving for summary judgment, the defendants emphasize certain statements in which the troopers and other witnesses opine that the shooting was necessary to protect the troopers' safety.  When asked to explain his reason for shooting, Trooper Price stated,

> I felt that my life was threatened.  I felt that the vehicle would have crushed me in between that vehicle and that cruiser had I not taken the action that I did.  Ah he could have possibly cut a hard left but then Trooper Snyder's life would be in danger.

See id. at 10-11.  Trooper Snyder stated that Trooper Price had "no way to escape."[6]  Snyder Stmt. 4.  Asked whether he had anything else to say that he felt was "pertinent," Trooper Snyder stated,

> I would just like to say that I feel that ah if he would have came forward anymore that Trooper Price would have been pinned between the vehicle and his truck and he had ever [sic] determination of not stopping and whatever means he was going to escape.

---

[5] The complaint also alleges that Trooper Price had a prior romantic relationship with Krein's ex-wife.  Compl. ¶ 4.  Krein, however, has offered no evidence to support that allegation, and his ex-wife has denied any romantic involvement with Trooper Price in a sworn affidavit.  Abbott Aff.

[6] Somewhat confusingly, Trooper Snyder explained that Krein's truck, when combined with the cruiser and fuel pumps, formed what "was kind of like a triangle shape and ah Trooper Price was wedged in the center of it, didn't have no way to escape." Snyder Stmt. 4.

Id. at 9.   In his affidavit, Jett stated that the "truck had not passed by the trooper when the trooper fired the second shot," and offered the following opinion:

> Based on my first-hand observations, it was clear both that Mr. Krein was willing to use his truck as a weapon against the trooper who was standing in front of his truck and that Mr. Krein would have hit the trooper with his truck if the trooper had not taken a quick step to his right . . . .

Jett Aff. ¶ 20.   Finally, when asked whether the trooper's life was in danger, McKinney stated, "Oh yeah.  If the boy would have shot the gas to it he would have pinned him against the car." McKinney Stmt. 2.

Notwithstanding these statements, a reasonable factfinder could still return a verdict for the plaintiff given some evidence supporting Krein, together with the troopers' potential bias and some inconsistencies in the testimony.  The defendants have a clear interest in representing that the shooting was justified.

A factfinder could interpret certain statements as contradicting the existence or reasonableness of the troopers' concerns for their safety.  Trooper Snyder stated that Trooper Price "stepped off to the side" before firing the second shot. Snyder Stmt. 5.  Regarding his own safety, Trooper Snyder stated that he had "slid out of the way" to prevent being run over. Id. at 6.  Both troopers could be found able to avoid the path

15

of the truck.  Also, while Jett stated on the 911 recording that
Krein tried to "run over" the troopers, he also stated that
Krein was "pulling around" them.  As mentioned above, the
account of the events in Jett's affidavit appears to be
inconsistent with other evidence and undermines his reliability.

In sum, viewing the facts and inferences drawn
therefrom in the light most favorable to Krein, a reasonable
factfinder might conclude, for example, that Trooper Price,
caught in the excitement of the encounter, fired the second shot
simply to prevent Krein from again evading his arrest.

The defendants assert they are entitled to summary
judgment based on qualified immunity.  "Qualified immunity
protects officers who commit constitutional violations but who,
in light of clearly established law, could reasonably believe
that their actions were lawful."  Henry v. Purnell, 652 F.3d
524, 531 (4th Cir. 2011) (en banc).  Entitlement to qualified
immunity "ordinarily should be decided by the court long before
trial."  Hunter v. Bryant, 502 U.S. 224, 228 (1991); see also
Knussman v. Maryland, 272 F.3d 625, 634 (4th Cir. 2001) ("[W]e
believe it is far better for the court, not the jury, to answer
the ultimate legal question of whether a defendant is entitled
to qualified immunity.").  The court assesses qualified immunity
using a two-step procedure whereby it "'asks first whether a
constitutional violation occurred and second whether the right

violated was clearly established.'"  Id. (quoting Melgar v.
Greene, 593 F.3d 348, 353 (4th Cir. 2010)).

        A right is "clearly established" if "[t]he contours of
the right [are] sufficiently clear that a reasonable official
would understand that what he is doing violates that right."
Saucier v. Katz, 533 U.S. 194, 202 (2001).  The Supreme Court
has clearly established that a law enforcement officer may not
apply "deadly force to prevent the escape of an apparently
unarmed suspected felon . . . unless it is necessary to prevent
the escape and the officer has probable cause to believe that
the suspect poses a significant threat of death or serious
physical injury to the officer or others."  Tennessee v. Garner,
471 U.S. 1, 3 (1985).

        The defendants argue that Trooper Price did not
"transgress a bright line" rule because officers may fire at
oncoming vehicles that threaten their safety.  Mem. Supp. Mot.
Summ. J. 13.  For the reasons explained above, however, whether
Trooper Price believed that his or Trooper Snyder's safety was
in danger is a genuine issue of material fact.  The qualified
immunity issue necessarily hinges on the excessive force inquiry
and cannot be decided at this stage.  See, e.g., Pena v. Porter,
316 F. App'x. 303, 310 (4th Cir. 2009) ("The district court
found that there were genuine issues of material fact precluding
summary judgment on Pena's excessive force claim regarding the

                            17

first two shots fired by Officer Porter. Until these issues could be resolved, the district court held that it was unable to rule on the issue of qualified immunity with respect to this claim. We agree."). If, as Krein appears to suggest, Trooper Price fired the second shot not out of fear for his or Trooper Snyder's safety or concern that Krein might present a threat to another, but merely to thwart Krein's escape, granting qualified immunity would be improper.

2. Article III, Section 6 of the West Virginia Constitution

State Law Count I asserts an excessive force claim against Trooper Price pursuant to the West Virginia Constitution. Article III, section 6 of the West Virginia Constitution provides that "[t]he rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated." W. Va. Const. art. III, § 6. The Supreme Court of Appeals of West Virginia has "traditionally construed Article III, Section 6 in harmony with the Fourth Amendment." State v. Duvernoy, 195 S.E.2d 631, 634 (W. Va. 1973). The court therefore analyzes Krein's Article III, section 6 claim under the Fourth Amendment's "objective reasonableness" standard.

In seeking summary judgment on this count the defendants again argue that Trooper Price's actions were

objectively reasonable.  However, the court having already
resolved in the context of Krein's federal claims that a
material issue of fact exists as to Trooper Price's belief that
he was in danger, summary judgment is likewise inappropriate for
Krein's state constitutional claim.


3. Vicarious Liability

        State Law Count II alleges that the State Police is
"vicariously liable for the acts of Defendants Price and Snyder
committed within the scope of their employment."  Compl. ¶ 28.
Under West Virginia law, a plaintiff who alleges the use of
excessive force by a trooper may also have a cause of action
against the State Police for vicarious liability.  Pruitt v. W.
Va. Dep't of Pub. Safety, 664 S.E.2d 175, 183 (W. Va. 2008).
The defendants' treatment of this count in the pending motion is
limited to a footnote: "Plaintiff also brought a state law claim
of vicarious liability.  Obviously, such a claim can only
succeed if there is a viable claim against Trooper Price."  Mem.
Supp. Mot. Summ. J. 5 n. 21 (internal citation omitted).  The
court having found that Krein has made a viable claim against
Trooper Price, summary judgment as to State Law Count II is
denied.

**4. Negligent Hiring/Retention/Supervision**

State Law Count III alleges that "Defendant West Virginia State Police failed to exercise reasonable care in the hiring, retention, training, and/or supervision of its employees, Defendants Price and Snyder."  Compl. ¶ 34.

West Virginia has recognized a cause of action based upon negligent hiring and retention.  See State ex rel. W. Va. State Police v. Taylor, 499 S.E.2d 283, 289 n. 7 (W. Va. 1997); McCormick v. W. Va. Dep't of Pub. Safety, 503 S.E.2d 502, 506-07 (W. Va. 1998).  The test for determining whether an employer has negligently hired and retained an employee is as follows:

> When the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee?  Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?

McCormick, 503, S.E.2d at 506.  Claims of negligent supervision and training have been treated like other claims based in tort.  See Taylor v. Cabell Huntington Hosp., Inc., 538 S.E.2d 719, 725 (W. Va. 2000).

The defendants first contend that the negligent hiring claim must be dismissed because Trooper Price acted reasonably.  Mem. Supp. Mot. Summ. J. 15.  As explained above, the reasonableness of his actions remains an issue of material fact.

20

Alternatively, the defendants assert that the record lacks any evidence indicating that the State Police should have reasonably foreseen a risk caused by hiring or retaining Trooper Price. Id.  Specifically, they state that Trooper Price's personnel file, of which Krein obtained a copy, contains nothing suggesting that Trooper Price was unfit for employment with the State Police.  Id.  Inasmuch as Krein offers no evidence whatsoever that indicates the State Police failed to conduct a reasonable investigation into Trooper Price's background or could have reasonably foreseen a risk of harm, the court grants summary judgment on this count to the defendant.

5. Intentional Infliction of Emotional Distress.

State Law Count V asserts a claim against Trooper Price for "Outrageous Conduct/Intentional Infliction."  Compl. ¶¶ 38-40.  Specifically, plaintiff alleges that "the actions of the individual defendants as aforesaid were outrageous, constitute the intentional infliction of mental, physical and emotional distress, were reprehensible, fraudulent, wilful and wanton, malicious, and in blatant and intentional disregard of Plaintiff's rights."  Id. ¶ 39.  The West Virginia Supreme Court of Appeals has explained,

> In order for a plaintiff to prevail on a claim for
> intentional or reckless infliction of emotional
> distress, four elements must be established. It must
> be shown: (1) that the defendant's conduct was

atrocious, intolerable, and so extreme and outrageous
as to exceed the bounds of decency; (2) that the
defendant acted with the intent to inflict emotional
distress, or acted recklessly when it was certain or
substantially certain emotional distress would result
from his conduct; (3) that the actions of the
defendant caused the plaintiff to suffer emotional
distress; and (4) that the emotional distress suffered
by the plaintiff was so severe that no reasonable
person could be expected to endure it.

Syl. Pt. 2, <u>Philyaw v. E. Associated Coal Corp.</u>, 633 S.E.2d 8, 9

(W. Va. 2006) (quoting Syl. Pt. 3, <u>Travis v. Alcon Labs.</u>, 504

S.E.2d 419, 421 (W. Va. 1998)).


        The defendants argue that if Trooper Price acted

reasonably or is entitled to qualified immunity, then his

conduct cannot be atrocious, intolerable, or outrageous.  Mem.

Supp. Mot. Summ. J. 14.  While this may be, the court has not

reached the prerequisite conclusions.  As the defendants assert

no further grounds for summary judgment respecting State Law

Count V, summary judgment is accordingly denied.


                    IV. Conclusion


        For the reasons herein, it is ORDERED that the

defendants' motion for summary judgment be, and it hereby is,

granted as to State Law Count III for negligent supervision, and

denied in all other respects.


                        22

The Clerk is directed to transmit copies of this Order to all counsel of record and any unrepresented parties.

ENTER:      June 11, 2013

John T. Copenhaver, Jr.
United States District Judge